**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>**Home Healthcare Renewal Services, Inc.**,<br><br>Debtor. | Chapter 11<br>Bankruptcy No. 23-03562<br>Honorable A. Benjamin Goldgar |

## SECOND AMENDED PLAN OF REORGANIZATION, DATED SEPTEMBER 18, 2023, FILED BY HOME HEALTHCARE RENEWAL SERVICES, INC.

Now comes Home Healthcare Renewal Services, Inc. (the "Debtor") propounding its Plan of Reorganization (the "Plan") under Chapter 11 of the Title 11 of the United States Code ("Bankruptcy Code"), proposing to pay its debts from future income generated by ongoing operations and the collection of outstanding receivables.

The Debtor is a subchapter V debtor, and this Plan is governed by subchapter V of the Bankruptcy Code, 11 U.S.C. 1181 *et seq*.

The Debtor's bankruptcy was filed in tandem with a related case, *Absolute Home Health, LLC* ("Absolute") (Absolute's case number 23-03559 in the United States Bankruptcy Court for the Northern District of Illinois) because the Debtor, due to a legacy cash management system, received income for Absolute, which conducted home healthcare services, issued invoices, maintained regulatory compliance, and so forth.

The Debtor provides administrative priority for its Debtor's bankruptcy counsel. Under §1123(a)(1) of the Bankruptcy Code, administrative expense claims and priority tax claims are not in classes. Neither the Debtor's proposed counsel, or the subchapter V trustee, have yet filed applications for administrative expense compensation.

Consequently, the Debtor's Plan divides claims into three classes. The first class provides for payment to the secured claim of BYZFUNDER NY, LLC, the "purchaser" under a "revenue purchase agreement" which provided for the Debtor to sell to it, at a discount, income from its future revenue streams.

The second class is the priority claim of the Illinois Department of

{00219808 2}

Employment Security. This class is miniscule, only $464.00. The third class is the class of general unsecured claims.

The Debtor's counsel's administrative fee and expense claims, as well as those of the subchapter V Trustee, are to be paid in full over the course of 24 months.

There are no claims of insiders, but if any such claims are levied, they will be subordinated and will not receive a distribution unless all other classes of creditors receive payment in full. Equity security holders will not receive a distribution.

All creditors should review this Plan in its entirety. **Your rights may be affected. You should read these papers carefully and discuss with your attorney. A Ballot Form is attached hereto as Exhibit A.**

**Exhibits to this Plan include:**

A. Ballot
B. Projection of income/ledger of receivables
C. Liquidation analysis
D. Monthly Operating Reports

## ARTICLE I: *Classification of Claims and Interests*

1.01   Class 1       Secured Claim of BYZFUNDER NY, LLC.

1.02   Class 2       Priority Claim of Illinois Department of Employment Security.

1.03   Class 3       General Unsecured Claims: Allowed claims of creditors which are unsecured.

## ARTICLE II: *Treatment of Administrative Claims and Trustee Compensation*

2.01   <u>Unclassified Claims</u>. Under §1123(a)(1) of the Bankruptcy Code, administrative expense claims and priority tax claims are not in classes.

2.02   <u>Administrative Expense Claims</u>.

   a. *Professional Fees*. Each holder of an administrative expense claim allowed under §503 of the Bankruptcy Code will be paid in full at a rate of $500.00 per month, commencing with the Effective Date of this Plan (as defined in Section 7.01), in cash. Before the 24th month of the plan concludes, the administrative expense claim will be paid in full from revenues generated by collection of outstanding receivables, or upon such other terms as maybe agreed upon by the

{00219808 2}

holder of the claim and the Debtor. With the Debtor's case being closely-interwoven with Absolute's, the estimated administrative expense claims payable to the Debtor's counsel with reference to this case is quite low, only $5,500.00 (including the measure of the chapter 11 filing fee that counsel advanced on the Debtor's behalf).

b. *United States Trustee Fees.* This case is a subchapter V Chapter 11 case. As such, no U.S. Trustee fees are required to be paid under 28 U.S.C. §1930(a)(6).

c. *Subchapter V Trustee Fees.* All fees required to be paid to the appointed subchapter V Trustee pursuant to Court order shall be paid in full within 60 days of the Court's order approving such fees.

2.03   Priority Tax Claims.

The Debtor is in the process of engaging accountants to determine tax liabilities. Priority tax claims total $8,969.51. The Debtor will satisfy these liabilities with payments totaling $149.49 per month total to the Internal Revenue Service, Illinois Department of Revenue, and Illinois Department of Employment Security.

## ARTICLE III: *Treatment of Claims and Interests Under the Plan*

Claims and interests shall be treated as follows under this Plan:

### 3.01   Class 1 – Secured claim of BYZFUNDER NY, LLC

As detailed in its proof of claim (3-1 on the general claims register of this case, as currently filed) BYZFUNDER NY, LLC purchased $51,800.00 in receivables from the Debtor for a purchase price of $35,000.00. At this time, it is owed $47,990.14, on which interest accrues at 9% per annum.

The Debtor proposes to pay the claim of BYZFUNDER NY, LLC, in full, with monthly payments of $996.19 per month, commencing 30 days after the effective date of the plan. BYZFUNDER NY, LLC will retain its lien on future revenues until its secured claim is paid in full.

### 3.02   Class 2 – Priority Claim of Illinois Department of Employment Security

Claim 4-1 of this case is the claim of the Illinois Department of Employment Security. It has filed a claim with a priority aspect of $464.00. The Debtor proposes to pay this claim with a single disbursement within 30 days of the plan confirmation order's becoming a final order.

### 3.03    Class 3 – General Unsecured Claims

General unsecured claims will be paid in full, pro rata, without interest, during the term of the plan.

General unsecured claims total $16,617.51. These will be paid, pro rata, with equal aggregate monthly payments of $276.96.

## ARTICLE IV: *History of the Debtor, Description of Assets (Liquidation Analysis) and Projected Income*

### 4.01    History of the Debtor

The history of the Debtor and Absolute, as relevant here, commences when it was purchased by Stori Worth ("Worth") and her husband, Carl, on or about January 18, 2019. Worth was a trained nurse, and Carl a businessperson.

By May of 2019, Carl had died. Worth attempted to keep the Debtor and Absolute afloat but without training to do so. Additionally, the seller the Debtor had – before the closing – entered into a loan agreement with the Small Business Administration. This loan was undisclosed at the time of purchase, and was for at least $133,249.92. This was seized by the SBA from payments that the Debtor and Absolute were entitled to receive from the federal government for payments due to the Debtor and Absolute by Medicare.

The 2020 COVID-19 pandemic, along the way, sharply reduced the market for home healthcare services being rendered by the Debtor and Absolute.

Finally, as detailed in 4.03 below, the Debtor and Absolute had – prior to the petition date – performed inadequately regarding their billing practices, leading to significant uncollected receivables. Finally, to make ends meet, the Debtor and Absolute resorted to lenders like BYZFUNDER NY, LLC.

It has only been the protection of the automatic stay and the rigor imposed upon them by the bankruptcy process that has enabled the Debtor and Absolute to turn things around. The Debtor and Absolute are improving their procedures and policies, collecting revenue at a rate higher than ever, paying staff and quarterly withholdings on a timely basis, and will be able to pay 100% of their claims owed.

### 4.03    Assets of the Debtor/Liquidation Analysis

The Debtor has minimal assets itself, and its continued existence is only as a waystation to Absolute's getting paid. When Medicare makes payment for services rendered, it knows that the Debtor's bank account was where it should pay. The Debtor and Absolute have been endeavoring to change this arrangement, and have

{00219808 2}

an acknowledgement of the same from Medicare, but as of this date, Medicare has not started making payment to Absolute.

The Debtor's value, as such, is in its relationship with Absolute, which (as detailed in its plan) holds significant uncollected receivables, as well as a strong reputation and referral business throughout the region.

Since the petition date, at least one serious offer has been made for the purchase of the Debtor and Absolute (and attendant employment of Worth) but this offer was predicated on conditions that the Debtor's counsel considered unacceptable, e.g., complete exclusivity. Worth is continuing to explore the possibility of selling the businesses.

The value of the Debtor is generated by the continued operations of the Debtor and Absolute. As a result, creditors will derive the most benefit from allowing the Debtor to restructure and generate income to satisfy the payments under the Plan.

    4.04    Projected Income

The Debtor must show that it will have enough cash over the life of the Plan to make the required Plan payments and operate its business.

The Debtor projects income to be derived from two sources – Absolute's ongoing income, and the collection of Absolute's unpaid receivables.

Financial projections, as such, are difficult to render, predicated as they are on the value of Absolute's uncollected receivables. Remittances from Medicare and insurance companies are regularly untimely even in the best of circumstances; the Debtor attaches to this Plan a copy, attached as Exhibit B, of Absolute's most recent ledger of receivables, totaling in value about $1.042 million dollars. The Debtor believes that the receivables are able to be collected. Nonethless, from an abundance of caution, if the Debtor were to discount their value by 20%, they would still have a value of about $833,600.00. There are no scheduled creditors that failed to file claims.

Exhibit C to this plan is a liquidation analysis. To its name, the Debtor has limited assets. However, its value is in its interrelationship with Absolute.

The Debtor will have cumulative projected disposable income (as defined by Section 1191(d) of the Bankruptcy Code for the period described in Section 1191(c)(2) sufficient to pay the required payments under the Plan. The Plan is a 5-year plan. The final Plan payment will be in approximately 2028.

    4.05    Operations During Chapter 11 Proceeding

{00219808 2}

Attached as <u>Exhibit D</u> are the Debtor's operating reports filed in the Chapter 11 proceeding as of this date. These reports reflect modest negative cash flow since the commencement of the case. However, given Absolute's positive cash flow and Absolute's significant receivables, it will be possible for the Debtor and Absolute to arrange their relationship such that the Debtor will be able to fund this plan.

**ARTICLE V:** *Allowance and Disallowance of Claims and Estimation of Claims*

5.01   <u>Disputed Claim</u>. A disputed claim is a claim that has not been allowed ordisallowed by a final non-appealable order and as to which either (a) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (b) no proof of claim has been filed and the Debtor has scheduled the claim as disputed, contingent or unliquidated. The Debtor scheduled no disputed claims.

5.02   <u>Estimation of Claims</u>. The Debtor may, at any time, request that the Bankruptcy Court estimate any the claim of any creditor pursuant to §502(c) of the Bankruptcy Code regardless of whether it ever files a proof of claim. In the event that the Bankruptcy Court estimates a disputed claim, the estimated amount may constitute either the amount of the allowed claim or a maximum limitation of the claim.

5.03   <u>Prepayment of Claims</u>. The Debtor reserves the right to offer prepayment of claims to creditors before the expiration of the Plan without penalty or premium. Acceptance of prepayment by creditors shall be purely voluntary. The prepayment shall be conditioned upon no affect or impairment of the Debtor's ability to satisfy its obligations under the Plan.

5.04   <u>Lapsed and Unclaimed Distributions</u>.

(a)   Any distribution that has not been cleared within ninety (90) days of the date of thedistribution will lapse.  Lapsed distributions will revert to the Debtor.

(b)   If any distribution is returned as undeliverable, no further distributions to such creditor will be made unless the Debtor is notified in writing of the creditor's current address. Upon receipt of the notification, the Debtor will remit all missed distributions to the creditor without interest. All claims for undeliverable distributions must be made on or before the first anniversary of the Effective Date of the Plan. If any claims are not made within that time, all unclaimed distributions will revert to the Debtor. Nothing in the Plan will require the Debtor to attempt to locate any holder of an allowed claim.

5.05   <u>Litigation Claims.</u> The Debtor does not anticipate filing any litigation

{00219808 2}

claims.

**ARTICLE VI:** *Provisions for Executory Contracts*

    6.01: <u>Medicare Provider Agreement</u>.

    **(a)**     **Assumption of Medicare Provider Agreement.** Debtor is enrolled as a Medicare provider of home health services under Part A of the Medicare Act. *See generally* 42 U.S.C. §§ 1395, *et seq.*, as amended (Title XVIII of the Social Security Act, commonly referred to as the Medicare Act). In accordance with that enrollment, Debtor has a Medicare provider agreement and a Medicare enrollment agreement with the Secretary of the Department of Health and Human Services (HHS) (the Secretary). To continue its participation in the Medicare program, the Debtor assumes these Medicare agreements pursuant to section 365 of the Bankruptcy Code. *See* 11 U.S.C. § 365. Provided that all issues regarding the cure of any defaults under the Medicare provider agreement are addressed to the satisfaction of the Centers for Medicare & Medicaid Services ("CMS"), a component agency of HHS, prior to the entry of the Confirmation Order, Debtor shall assume the Medicare provider agreement and the Medicare enrollment agreement upon the entry of the Confirmation Order (the "Assumption Date").

    **(b)**     **Cure Prior to Assumption.** In lieu of a designation of a specific cure amount payment for monetary defaults under the Medicare Agreements, and to assure adequate future performance under the Medicare Agreements, the Debtor shall continue its participation in the Medicare program in the ordinary course of business, and shall comply with all applicable Medicare program requirements as set forth in the Medicare Act, as well as all relevant regulations, policies, procedures, and CMS manual provisions. Notwithstanding anything to the contrary in the Confirmation Order, the Plan, any exhibits thereto (now or as amended), or in the related documents, the term "cure," for purposes of Debtor's assumption of the Medicare agreements, means being governed by and subject to the terms and conditions of the Medicare provider agreement and the incorporated statutes and regulations, and remaining liable for any debt to CMS as if the bankruptcy case had not occurred. In agreeing to this proposed cure, HHS and CMS do not make any representations regarding Debtor's past, present or proposed plans for future operations, which will be required to comply with all relevant regulations, policies, and procedures. In agreeing to this cure, HHS and CMS also do not approve, deny, or otherwise make any representations regarding any decisions or determinations that CMS may make in relation to the Debtor and the Medicare program, including, but not limited to any future Medicare enrollment applications, Medicare certification determinations, or claims submitted to Medicare. For the avoidance of doubt, the Debtor will remain liable for any amounts owed the Medicare Act and the United States may collect such amounts in the matter, notwithstanding any discharge or other relief provided through this bankruptcy case, and irrespective of whether the amount owed arose prior to or after the effective date of the Plan.

**(c)     CMS Claims Unimpaired.** All of CMS's claims shall be unimpaired under 11 U.S.C. § 1124 and shall pass through the bankruptcy case unaffected by the Plan and/or any other court order in this case. Any amounts due on CMS's claims may be collected in the ordinary course of business, and the United States, on behalf of CMS, shall not be required to file any separate claim in the bankruptcy to collect any amounts due to CMS under the Medicare program, whether via proof of claim, claim for cure, or administrative claim. Accordingly, if CMS determines that there are any Medicare overpayments owed by or underpayments owed to Debtor—whether arising from medical services furnished pre-petition, post- petition, or after the effective date of confirmation—CMS may adjust ongoing payments to the Debtor or otherwise recover any overpayments or pay out any underpayments in accordance with the Medicare statute, regulations, policies, and procedures. Nothing in this Plan shall release (or operate to enjoin) any claim, right or defense by the United States, on behalf of CMS, against the Debtor or any other party.

**(d)     The Anti-Assignment Provisions of the Medicare Act.** If any lender, creditor, or other entity were to seek direct payment from CMS or its Medicare contractors of reimbursement due the Medicare provider before, during or after the assumption and assignment of the Medicare provider agreement, that lender, creditor, or other entity must do so in accordance with the applicable anti-assignment provisions of the Medicare Act and CMS's implementing regulations. 42 U.S.C. §§ 1395g(c) & 1395u(b)(6); 42 C.F.R. §§ 424.73 & 424.90.

**(e)     The Medicare Act's Jurisdictional Limitations.** Notwithstanding any other provisions of the Confirmation Order, Plan and related documents, all agreements, issues, and disputes arising under the Medicare Act, 42 U.S.C. § 1395, *et seq.*, shall be governed exclusively by Medicare statutes, rules, regulations, and procedures for administrative and judicial review, without regard to the Bankruptcy Code or Bankruptcy Rules. Without regard to when the events giving rise to the issue or dispute occurred, the jurisdictional limitations of the Medicare Act shall apply. *E.g.,* 42 U.S.C. §§ 405(g),(h) & 1395ii. Such limitations include but are not limited to the Medicare provider's presentment of claims and exhaustion of administrative remedies under the relevant statutory process for administrative review of Medicare provider enrollment, certification, reimbursement or other Medicare determinations. *See, e.g.,* 42 U.S.C. §§ 405(g)-(h), 1395ii, 1395ff, 1395oo.

The debtor is party to no other leases.

The Debtor is seeking to engage professionals to assist with collection and other services; whether pre- or post-confirmation, the Debtor will seek Court approval for such engagement.

**ARTICLE VII:** *General Provisions*

{00219808 2}

    7.01    <u>Definitions and Rules of Construction</u>. The definitions and rules of construction set forth in §§101 and 102 of the Bankruptcy Code shall apply when terms defined or construed inthe Code are used in this Plan.  These definitions are supplemented by the following:

    (a)    The Effective Date ("<u>Effective Date</u>") of the Plan will be the 30th day after the Order confirming the Plan is a final order.

    (b)    The "Debtor" refers to the Debtor either preconfirmation or postconfirmation, as the case may be.

    7.02    <u>Conditions to Effective Date</u>. The following conditions precedent may affect the occurrence of the Effective Date: (1) failure to obtain confirmation; (2) modification of the Plan, which requires approval of the court; (3) the Order of Confirmation is vacated, amended, modified or stayed; or (4) the Order of Confirmation is the subject of any appeal, reconsideration or other review.

    7.03    <u>Contested Plan Confirmation</u>. If the Debtor does not receive sufficient votes to confirm the Plan, pursuant to Section 1191(b), the Debtor shall seek to confirm the Plan as it does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired and have not accepted the Plan. In the event of a contested confirmation, the Debtor shall remain as the Disbursing Agent for all Plan payments.

    7.04    <u>Remedies Upon Default</u>. In the event that the Debtor fails to make its Plan payments when due, and does not cure any such default within 30 days of the occurrence of such default, creditors may seek relief from the Plan injunction to enforce the terms of the Plan or, if the case has been closed, may enforce the terms of the Plan without further relief from the Bankruptcy Court.

    7.05    <u>Severability</u>. If any provision of this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

    7.06    <u>Binding Effect</u>. The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of the entity.

    7.07    <u>Captions</u>. The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

    7.08    <u>Controlling Effect</u>. Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Illinois govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as

{00219808 2}

otherwise provided in this Plan.

    7.9    <u>Disbursing Agent</u>. Stori Worth will be the disbursing agent for the Debtor for the purpose of distributions and payments to be made pursuant to the Plan.

    7.10    <u>Notice</u>: Any Notice of Default shall be sent to the Debtor's counsel by e-mail to jstorer@wfactorlaw.com and wfactor@wfactorlaw.com, and shall be effective when sent. Any Notice of Default must also be sent to the Debtor via first-class mail at 1715 N. Division St., Suite 7, Morris, IL 60450. Debtor may notify creditors, in writing, of any change of address for either the Debtor or counsel.

## ARTICLE VIII: *Discharge, Return of Property and Vesting of Assets*

    8.01    <u>Discharge</u>. On the Effective Date, the Debtor will be discharged from any debt that arose before confirmation of the Plan to the extent specified in §1141(d)(1)(A) of the Bankruptcy Code. However, the Debtor shall not be discharged of any debt imposed by the Plan. After the Effective Date, your claims against the Debtor will be limited to the debts described in clauses (i) through (iii) of the preceding sentence. Notwithstanding the foregoing, discharge of BYZFUNDER NY, LLC's debt is as of the Debtor's completion of payments to it.

    8.02    <u>Vesting of Assets</u>. On the Effective Date of the Plan, Debtor's right, title and interest in and to its assets shall vest with the Reorganized Debtor.

## ARTICLE IX: *Retention of Jurisdiction*

The Bankruptcy Court shall retain jurisdiction over this Chapter 11 Case for the following purposes:

    9.01 Resolution of any and all objections to claims and requests to estimate claims.

    9.02 Determination of all questions and disputes regarding all causes of action, controversies, disputes or conflicts, whether or not subject to pending actions as of the Effective Date between (a) the Reorganized Debtor and any other party or (b) otherwise under the Plan, the Confirmation Order or any other order issued by the Bankruptcy Court in connection with this Chapter 11 Case.

    9.03 The correction of any defect and the curing of any omission or inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan.

    9.04  Modification of the Plan after confirmation pursuant to the Bankruptcy Code and the Bankruptcy Rules.

{00219808 2}

9.05 Allowance of all claims and applications for payment of Administrative Claims and professional fees and expenses which may be paid by the Reorganized Debtor or its estate pursuant to the provisions of the Bankruptcy Code, and resolution of all disputes pertaining thereto.

9.06 Entry of a Final Order confirming substantial consummation of the Plan and closing the Chapter 11 Case.

Dated: September 18, 2023                Home Healthcare Renewal Services, Inc.,

By: /s/ Justin R. Storer

One of Its Attorneys
William J. Factor (6205675)
Justin R. Storer (6293889)
**FACTORLAW**
105 W. Madison Street, Suite 1500
Chicago, IL 60602
Tel:    (312)373.7226
Fax:    (847) 574-8233
Email: jstorer@wfactorlaw.com

{00219808 2}